UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

ROBERT GREEN, et al.,

    Plaintiffs,

v.                                         Case No. 15-10434

LIBERTY INSURANCE CORPORATION,

    Defendant.

                                                 /

**OPINION AND ORDER RESOLVING CROSS-MOTIONS FOR SUMMARY JUDGMENT AND ORDERING PLAINTIFFS TO SHOW CAUSE**

Insured Plaintiffs Robert and Verge Green, a married couple, along with their adult son Plaintiff Desmond Green, allege that Defendant Liberty Insurance Corporation breached their homeowners' insurance contract by wrongly denying their claim resulting from the alleged theft of personal property from their home. (Dkt. # 1.) Before the court are the parties' cross-motions for summary judgment. (Dkt. ## 25, 26.) Plaintiffs have declined to file a brief in reply to Defendant's Response to Plaintiffs' Motion for Summary Judgment. (Dkt. # 27.) Otherwise, the motions have been fully briefed and a hearing was held November 9, 2016. For the reasons that follow, the court will deny Plaintiffs' motion and grant Defendant's motion.

## I. BACKGROUND

The following facts are not genuinely disputed unless otherwise noted.[1] On January 29, 2015, Robert Green reported an alleged home theft at a house he owned at 608 East Ellen Street in Fenton, Michigan. (Dkt. # 25-3.) Robert told the responding police officer:

- He had returned home to find the locks had been changed and a lockbox left attached to the door with instructions to contact the local property company "Five Brothers" for the combination to the lockbox, which contained a key. (*Id.* at Pg. ID 666.)

- He was behind on his mortgage and the bank had hired Five Brothers to winterize the house, mistakenly believing it to be unoccupied. (*Id.*)

- Upon opening the door, he discovered that the house had been ransacked and several valuable items stolen, including three guitars, eleven video game consoles, a keyboard, and a "sequencer," worth approximately $10,000 in total. (*Id.*)

The officer contacted Becky Thomas at Five Brothers, who stated that US Bank had hired Five Brothers to secure and winterize the house. (*Id.*)[2] Five Brothers then hired Diverse Properties to complete the securing and winterizing, who in turn hired A&E Lawn Care. (*Id.*) A&E Lawn Care is wholly owned and run by Richard Angelo Vasquez. (*Id.*) The owner of Diverse Property told the officer that she had never had an

---

[1] As the court discussed in the November 9, 2016 hearing on this matter, Plaintiffs' counsel has repeatedly mischaracterized or contradicted the record, both in briefing and during oral argument. The court finds this apparent lack of candor troubling.

[2] Plaintiffs deny that there had been a foreclosure, stating that Robert was in a "modification" or "workout." (Dkt. # 25-5, Pg. ID 687; Dkt. # 26, Pg. ID 818.) Public records show that the property had been foreclosed on and went to foreclosure sale on October 16, 2013 and that the redemption period expired on April 16, 2014. (Dkt. # 25-4.)

issue with Vasquez and sent the officer a written statement that Vasquez had emailed to Diverse Property. The statement read:

> My name is Angelo Vasquez, I am the owner of A&E Lawn Care. I received work order #46812 on January 14th, 2014 to be performed at 608 Ellen Dr. in Fenton, Michigan.. [sic] An employee of mine, Alonzo Olivarez and I arrived at the home at 1:33pm. Upon arrival we noticed that the driveway had been plowed, therefore we suspect [sic] the home may be occupied. We proceeded to approach the property to verify occupancy. We did not get an answer at the door and we were unable to look inside the home through the windows. At this time we inspected the exterior of the property and we were still unable to verify occupancy. I proceeded to break the lock on the front door because it was the only door we could gain access through. Once we entered the home we determine that there was a possibility that the home was indeed occupied. At this time Al called the office and spoke with Tom to make sure we had the correct address and to verify if the home was supposed to be occupied or not. Tom checked the address and described the home to confirm we were at the correct address. Address was correct and the home matched the description. I informed Tom that the home had personals and appeared occupied. He then instructed me to proceed with the work order.
>
> Alonzo and I entered the home and proceeded to complete a lock change, installed a lock box, completed a winterization and took photos of the entire interior and exterior of the home. We were the only ones inside the home and we did not remove any personals. We took photos of all personals that were in plain view, however we did open some kitchen cabinets to confirm signs of occupancy and to place the old lock in the kitchen drawer as instructed.
>
> . . .
>
> Lastly, we were told that some personals were missing from the home. I have been in business for 14 years, I work for 2 other property preservation companies and I can assure you that I know the risks of removing personals without a work order. This home appeared occupied, that is why we did not make any attempt to even disturb anything in the home while photographing it, besides what needed to be touched. I don't know if this is a tactic by the homeowner to make an unlawful claim or because he is upset that we entered the home.
>
> I assure you that neither one of us took anything from that home. We take full responsibility for the spilled water from the water meter and the blue dye on the bathroom carpet and wall but we did not touch nor remove any

    personals from the home. I am also attaching a time line, indicating the timely manner in which the work order was completed.

(*Id.*) Five Brothers also told officers that they had done business with Vasquez for ten years and had received no complaints. The police were unable to reach Alonzo Olivarez. (*Id.*) Ultimately, the police closed the case for lack of "necessary information needed to track down the reported stolen items." (*Id.* at 671.)

    A few days after the incident, Robert filed his insurance claim with Defendant, seeking about $100,000. (Dkt. # 28-2, Pg. ID 1156.) With his claim, Robert provided a list of allegedly stolen items, including seven guitars, two keyboards, a saxophone, a diamond ring, and a snowblower, among other items, that were not reported to the police. (Dkt. # 28-5.) In addition, Robert sought reimbursement for over 1,000 video game discs or cartridges, allegedly worth $38,855 in total. (*Id.*) Robert's claim stated that he or Desmond owned most of these items for ten years or more.[3]

    Defendant assigned Derek Maki of to investigate Robert's claim. (Dkt. # 28-4, Pg. ID 1201.) Maki spoke to each Plaintiff, the police officers, representatives of Five Brothers, and several of the Green's neighbors. (*Id.* at Pg. ID 1211-13.) Maki asked Robert if the list was accurate, and he stated that it was. (*Id.*) Maki also reviewed the police report and photographs taken by Vasquez during the winterization. (*Id.* at Pg. ID 1215-16.) Maki testified that, based on his investigation, he concluded that Robert had "made material misrepresentations about what was stolen from his house and, therefore, violated the policy provisions." (*Id.* at Pg. ID 1215.) In particular, Maki

---

[3] Robert clarified in his deposition testimony that he listed the length of time he had owned each item under the column heading "approx. age." (Dkt. # 28-2, Pg. ID 1157.)

concluded that Robert "inflated" the claim by including items that were not actually stolen or that he never actually owned. (*Id.* at Pg. ID 1215, 1238-43.)[4]

Maki then called Robert to explain that the claim was denied and that he would receive a denial letter. (*Id.* at Pg. ID 1302.) Maki sent Robert the letter on August 26, 2014. (Dkt. # 28-6.) The letter stated in pertinent part:

> This decision is based on information gathered throughout the course of our investigation into your claim. This information includes but is not limited to your loss location, and the review of documents submitted or obtained in connection with your claim. Based upon this, there is insufficient evidence to support this loss occurred as it was reported and we respectfully deny your claim.
>
> I draw your attention to the language in your homeowners policy:
>
> SECTIONS I AND II – CONDITIONS
> 2. Concealment Or Fraud
> (2) With respect to loss caused by a peril other than fire and with respect to all "insureds" covered under this policy, we provide no coverage for loss under Section I – Property Coverages if, whether before or after a loss, one or more "insureds" have:
> (a) Intentionally concealed or misrepresented any material fact or circumstances;
> (b) Engaged in fraudulent conduct' or
> (c) Made false statements;
> relating to this insurance.

(*Id.*)[5] After receiving the denial letter, Plaintiffs filed the instant lawsuit.

---

[4] Plaintiff's repeated averments in briefs and oral argument that Maki "readily admits that he believes items were stolen" do not accurately reflect the record. (*E.g.* Dkt. # 26, Pg. ID 820-21.) Plaintiff appears to rely on Maki's statement that he "made a note that there is some evidence which may indicate a theft occurred." (Dkt. # 28-4, Pg. ID 1258.) But this statement falls far short of "readily admit[ting] that he believes items were stolen." In fact, Maki testified that his conclusion was that Robert's list of stolen items "was a misrepresentation of what was stolen, *if anything,* from his house . . . ." (Dkt. # 28-4, Pg. ID 1274 (emphasis added).)

[5] Both parties attached excerpts from the insurance policy as exhibits. (Dkt. ## 25-2, 26-9.) The relevant section in both policies contains different language than that

Both Robert and Desmond have previously filed for bankruptcy. Robert filed his Chapter 7 petition on August 25, 2010. (Dkt. # 25-10.) In his petition, he declared that the total value of his personal property at the time was $6,681. (*Id.*) Robert reported $4,000 of household goods and furnishings, including audio, video, and computer equipment, $150 for collections or collectibles, and nothing for "firearms and sports, photographic, and other hobby equipment." (*Id.*) The bankruptcy court discharged Robert's debts in connection with his petition on December 2, 2010. (Dkt. # 25-13.)

At his deposition, Plaintiff's counsel asked Robert about the discrepancies between his bankruptcy petition and his insurance claim. (Dkt. # 28-2, Pg. ID 1157.) After a brief series of questions, in which Robert stood by his claim and confirmed that at the time of his bankruptcy, he had owned three guitars, which he currently values at thousands of dollars each, a $2,500 "Roland Workstation", and a $2,800 keyboard, among other items, Defense counsel instructed Robert not to answer based on his Fifth Amendment right against self-incrimination. (*Id.* at 1165-67.)[6]

---

quoted in the denial letter. However, in their briefs, both parties quote and rely on the policy language as stated in the denial letter, even while citing the attached policies. (Dkt. # 25, Pg. ID 602; Dkt. # 26, Pg. ID 825.) The court's analysis is the same under either wording.

[6] Plaintiffs' averments that "[Robert] was never instructed not to answer and in fact [Robert] did answer the questions[]" are plainly false. (Dkt. # 28, Pg. ID 1129 n.2.) After informing Robert of his Fifth Amendment right against self-incrimination, Defendant's counsel asked Robert if he was going to answer or decline to answer, and Plaintiff's counsel interjected, "I'm instructing him not to answer." (Dkt. # 28-2, Pg. ID 1165.) In response to Defendant's counsel stating "but your objection didn't instruct him not to answer, it instructed him that he had a Fifth Amendment right that he could assert if he wanted[,]" Plaintiff's counsel stated, "No, it says he has a Fifth Amendment right that he can assert, and I said, and therefore, I said because the weight of a bankruptcy petition being signed can carry along with it the penalty of criminal sanctions, I am instructing him not to answer." (*Id.*) After a brief back-and-forth concerning the two

6

About twelve years before the alleged robbery, on October 18, 2003, Desmond filed for Chapter 13 bankruptcy and put the total value of his personal property at $9,151. (Dkt. # 25-14.) Desmond's petition stated that he owned "miscellaneous jewelry" worth $500 in total. (*Id.*) Desmond indicated that he owned no "collections or collectibles" and, under "firearms and sports, photographic, and other hobby equipment," Desmond listed "video recorder and fight gear" worth $1,250 in total. (*Id.*) Desmond's Chapter 13 plan was confirmed by the court on May 17, 2005. (*Id.*)

In his deposition, Desmond testified that he owned most of the video games included in the insurance claim, and that he had been collecting them "since [he] was twelve." (Dkt. # 25-8, Pg. ID 713.) Desmond explained that the games ranged in value, up to $250 each for the Neo Geo game cartridges that he owned or co-owned with Robert, thirty of which were listed as stolen in the claim. (*Id.*) Desmond also testified that the diamond ring listed in the claim was his, that he had purchased it in 2001 for $2,700 plus tax, and that he was seeking the then-sticker price of $5,000 in the insurance claim. (*Id.* at Pg. ID 714.) He also stated that the saxophone was his, which the claim states was owned for eighteen years and worth $3,000. (*Id.*, Dkt. # 25-6.)

Defendant argues that Robert and Desmond's bankruptcy petitions conflict with the insurance claim and justify judicial estoppel, entitling Defendant to summary judgment. (Dkt. # 25.) For the reasons that follow, the court agrees.

## II. STANDARD

---

guitars Robert claims to have received from his brother, Plaintiff's counsel again objected, stating, "He's got a Fifth Amendment right. We've been through that before. Stop asking these questions. You're not entitled to that information." (*Id.* at Pg. ID 1166.)

7

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). The movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]hat burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (internal quotation marks omitted).

The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). In evaluating a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . credibility judgments and weighing of the evidence are prohibited." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (internal quotation marks and citations omitted).

### III. DISCUSSION

Judicial estoppel is an equitable doctrine meant to "protect the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine,* 532 U.S. 742, 749-50

(2001) (internal quotation marks and citations omitted). The doctrine holds that "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position he may not thereafter, simply because his interests have changed, assume a contrary position[.]" *Id.* at 749 (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). Courts looks to several factors in determining whether judicial estoppel is appropriate:

> First, a party's later position must be 'clearly inconsistent' with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would 'create the perception that either the first or the second court was misled[.]' Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* at 750-51 (internal citations omitted). The Sixth Circuit has described judicial estoppel "as a rule against playing fast and loose with the courts, blowing hot and cold as the occasion demands, or hav[ing] [one's] cake and eat[ing] it too." *Lewis v. Weyerhaeuser Co.*, 141 F. App'x 420, 424 (6th Cir. 2005).

This court has applied judicial estoppel to similar circumstances. *E.g.*, *Geller v. American Ins. Co.*, 2014 WL 920740 (E.D. Mich. March 10, 2014) (Cleland, J.). The plaintiff in *Geller* had allegedly been robbed of nearly $70,000 in jewelry and sued his insurer after it refused to pay his premium, citing "false statements" made in his claim. *Id.* at *1. The plaintiff stated his claim and in deposition testimony that he had owned most of the jewelry since the 1990s. *Id.* But the plaintiff had not declared the jewelry in his 2004 bankruptcy proceeding, and in fact admitted to lying in the petition. *Id.* The court applied judicial estoppel and granted summary judgment to the defendant. *Id.*

Here, Robert and Desmond attempt to argue that a variety of items that they have owned for fifteen years or more were stolen from them. But that position is clearly inconsistent with their prior bankruptcy petitions, in which they did not disclose ownership of those items. Robert was granted a discharge and Desmond's Chapter 13 plan was confirmed, indicating that both succeeded in persuading the bankruptcy court that they did not own these items. (Dkt. ## 25-11, 25-15.) Finally, Plaintiffs would gain an unfair advantage either by hiding property that should have been included in the bankruptcy estate – cheating their creditors – or by claiming insurance proceeds for property they did not actually own – cheating Defendant. The court concludes that the present action, like *Geller*, calls for judicial estoppel.

Plaintiffs attempt to characterize the discrepancies as relating to the value of the items in question. (Dkt. # 28, Pg. ID 1132.) But Robert and Desmond's petitions omitted the items altogether – the discrepancy goes to whether these items exist or were owned by Plaintiffs at all. (Dkt. ## 25-10, 25-14.) In their response brief, Plaintiffs state that "the items on his list as submitted to [Defendant], were received from [Robert's] brother just prior to his death . . . and the timing of this is **after** the Bankruptcy concluded. [sic]" (Dkt. # 28, Pg. ID 1128-29 (emphasis in original).) However, nowhere does the record establish this timing, Robert only stated that he received two guitars – not all the items in question – from his brother, and Robert's testimony and the claim state that he actually bought and owned the guitars decades ago. (Dkt. # 28-2, Pg. ID 1166.) Further, Plaintiffs fail to address the discrepancies related to Desmond Green's petition.

Both parties misapprehend how judicial estoppel applies to the present case. For Plaintiffs' contract claim to succeed, they must not have included materially false

10

statements about what was stolen. (Dkt. # 28-4, Pg. ID 1240-41.) Their insurance claim states that certain guitars, keyboards, video games, and jewelry, among other personal property, were stolen. (Dkt. # 25-6.) For these statements to be true, Plaintiffs must have owned the allegedly stolen items. Indeed, in his sworn deposition, Robert states that he owned several of these items for decades. (Dkt. # 25–5, Pg. ID 692.) His claim indicated, for instance, that had owned six of the allegedly stolen guitars for fifteen years or more. (Dkt. # 25-6.) But if that were true, Plaintiffs' argument in the present case would conflict with Robert's bankruptcy petition that omitted all of these – apparently quite valuable – items. (Dkt. # 25-10, Pg. ID 726-29.) The same is true for Desmond's bankruptcy, in which he omitted thousands of dollars in video games and jewelry that he now avers he owned at the time. (Dkt. # 25-14, Pg. ID 786-88; Dkt. # 25-6; Dkt. # 25-8, Pg. ID 715.) Judicial estoppel bars them from contradicting their sworn statements in the earlier bankruptcy proceedings. *Geller*, 2014 WL 920740. As a result, Robert and Desmond are estopped from arguing that they owned these items in the present case. This precludes Plaintiffs from establishing that they owned a significant portion of the items that they stated were stolen in their insurance claim. The court necessarily concludes that they did not own many of the items that they claimed were stolen from them, rendering those statements false. As a matter of law, then, Plaintiffs included materially false statements in their insurance claim, justifying Defendant's denial under the policy. *See Geller*, 2014 WL 920740.

      Plaintiffs' arguments against the application of judicial estoppel are unavailing. First, Plaintiffs argue that Defendant has waived any judicial estoppel defense by failing to raise it in its answer. (Dkt. # 28, Pg. ID 1124-27 (citing Fed. R. Civ. P. 12(h)).) But

judicial estoppel is not an affirmative defense within the meaning of the federal rules, it is "an equitable doctrine invoked by the court at its discretion." *New Hampshire*, 532 U.S. at 750; *see also Mirando v. U.S. Dept. of Treasury*, 766 F.3d 540, 544 (6th Cir. 2014) (applying judicial estoppel when doctrine first raised by defendant in its reply brief for summary judgment). Defendant has not waived judicial estoppel – nor could it.

Next, Plaintiffs argue – without citing to supporting authority – that judicial estoppel cannot apply because Defendant did not rely on any statements in the bankruptcies to deny Plaintiffs' claim. (Dkt. # 28, Pg. ID 1129-36.) Plaintiffs unsupported argument is misguided. Judicial estoppel exists to prevent Plaintiffs from taking one position when it is beneficial – omitting property that would otherwise be liquidated in their bankruptcy proceeding – and contradicting that position in a later proceeding when Plaintiffs' interests change. *Lewis*, 141 F. App'x at 424. Whether or not Defendant denied Plaintiffs' claim based on what was stated in Robert and Desmond's bankruptcy petitions is irrelevant to the question of whether the court will allow Plaintiffs to contradict their sworn statements in the earlier proceedings. Plaintiffs' argument that judicial estoppel does not apply to Desmond because he is not an "insured" under the policy is mistaken for the same reason. (Dkt. # 1137-38.)

Third, Plaintiffs argue that "*even* an inadvertent mistake" or inaccurate statement in the bankruptcy petition that contradicts the later claim "is acceptable, as long as there is corresponding testimony" explaining the discrepancy. (Dkt. # 28, Pg. ID 1131 (emphasis in original) (citing *Liberty Mut. Fire Ins. Co. v. Scott*, 486 F.3d 418, 421-23 (8th Cir. 2007).) But Plaintiffs misapprehend *Scott*: the Eighth Circuit declined to address judicial estoppel entirely because the district court had concluded that "[n]o

rational jury would be able to reconcile the difference between [Scott's] stated personal property in the bankruptcy and in the insurance claim less than a year later." *Id.* at 422. Because nothing in the record suggested that Scott's statements in the bankruptcy petition were inaccurate, a reasonable jury could only conclude that Scott had made material misrepresentations in her claim. *Id. Scott* does not preclude application of judicial estoppel when parties can explain away the change in position. *Id.*

Finally, Plaintiffs argue that because "Defendant makes no contention against [Verge] for misstatement, fraud, or misrepresentation . . . any items of personalty which she is an owner or partial owner does not appear to be an issue for purposes of this Motion. [sic]" (Dkt. # 28, Pg. ID 1138.) Even if that were true, Verge testified in her deposition that she does not own any of the items allegedly stolen from the house or the house itself. (Dkt. # 25-16, Pg. ID 811.)

## IV. CONCLUSION

For the above reasons, Defendant's Motion for Summary Judgment (Dkt. # 25) is GRANTED with respect to Plaintiff Robert Green and Plaintiff Desmond Green. Plaintiffs' Motion for Summary Judgment (Dkt. # 26) is DENIED.

It is not clear to the court why Verge is a party to this proceeding – she appears to have no insurable interest in the property. During Verge's deposition, Plaintiffs' counsel stated, "[S]he may not have any ownership interest in the actual items, but I think as a matter of law – because she's on the contract of insurance, I think by law we're required to name her . . . . If [the claim] gets paid out, it would go to its rightful owner." (Dkt. # 25-16, Pg. ID 811.) The court is unaware of any such requirement and Plaintiffs have not addressed the issue. Accordingly,

IT IS FURTHER ORDERED that Plaintiff Verge Green is DIRECTED to SHOW CAUSE no later than **5 p.m. on November 24, 2016** as to why the court should not enter summary judgment as to all claims she may have against Defendant relating to this matter.

          /s/ Robert H. Cleland
          ROBERT H. CLELAND
          UNITED STATES DISTRICT JUDGE

Dated: November 16, 2016

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, November 16, 2016, by electronic and/or ordinary mail.

          s/Lisa Wagner
          Case Manager and Deputy Clerk
          (313) 234-5522